UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: : | Chapter 11 |
| : | |
| APHTON CORPORATION, : | Case No. _____ (\_\_\_) |
| : | |
| Debtor. : | |

## AFFIDAVIT OF PATRICK T. MOONEY IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) |
| | ) ss. |
| COUNTY OF PHILADELPHIA | ) |

PATRICK T. MOONEY, M.D., being duly sworn, declares as follows:

1. I am Chief Executive Officer of Aphton Corporation.

2. Aphton Corporation, the debtor and debtor-in-possession herein (the "Debtor"), is a Delaware corporation with executive offices located at 8 Penn Center, 1628 JFK Boulevard, Suite 501, Philadelphia, PA 19103. Its taxpayer identification number is 95-3640931.

3. The Debtor is a publicly-traded biopharmaceutical company that researches and develops and commercializes pharmaceutical products for the treatment of cancer and gastrointestinal disease. Its research and development efforts are based on its proprietary active immunization and monoclonal antibody technologies.

4. The Debtor presently employs approximately 11 people on a full/part-time basis. For the twelve months ended December 31, 2005, the Debtor reported a net loss of $65,486,000.

5. My duties as Chief Executive Officer include, among other things, the oversight of the Debtor's business and operational affairs, the preparation and implementation of business plans and strategies and the management of the Debtor's employees. I have authority to submit this Affidavit on behalf of the Debtor.

6. With the assistance of other employees, legal counsel and advisors, I have directed and have been actively involved in the Debtor's efforts to restructure its business and financial affairs and otherwise preserve and maximize the value of the Debtor's assets. I have general knowledge of the Debtor's books and records and am generally familiar with the Debtor's financial and operational affairs.

7. I submit this Affidavit, on behalf of the Debtor, in support of the first day motions and applications of the Debtor in this chapter 11 case. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, review of relevant documents, or opinions based upon my experience and knowledge of the Debtor's financial and operational affairs. If I were called to testify, I could and would testify competently to the facts set forth in this Affidavit.

8.      The Debtor believes that the relief sought in its first day motions and applications is necessary to enable the Debtor to continue operating effectively as a debtor-in-possession following the filing of its chapter 11 case to preserve its going-concern value pending the sale of its business and to establish a process for a sale of its assets in a manner designed to maximize value for the benefit of its creditors.

9.      The failure to grant the first day motions would have a deleterious effect upon the Debtor's business and its ability to consummate timely a sale transaction designed to provide the greatest potential recovery for its creditors.

10.     Part I of this Affidavit describes the business of the Debtor and the developments that led to the filing of its chapter 11 petition. Part II sets forth the relevant facts in support of the various first day motions and applications filed by the Debtor concurrently herewith.

## I. BACKGROUND

### A.    Formation

11.     Currently headquartered in Philadelphia, the Debtor was initially incorporated in California in 1981. The company was reincorporated in Delaware on October 30, 1997 as a result of a merger and was authorized to do business in Pennsylvania as a foreign corporation as of May 21, 2004.

### B.    The Debtor's Market and Products

12.     The Debtor is a biopharmaceutical company focused on the research and development of pharmaceutical products for the treatment of cancer and gastrointestinal disease. The Debtor's lead product-candidate, Insegia, is an immunotherapy drug designed to target and inhibit the activity of gastrin, a hormone that initiates cell growth and plays a critical role in diseases of the gastrointestinal and reproductive systems, including cancer. Insegia is intended to be used as a non-toxic, non-chemotherapeutic therapy.[1]

---

[1] Insegia™ is an active immunotherapy designed to target and inhibit the activity of the gastrin hormone. Insegia works by harnessing the body's own immune system to generate high levels of antibodies to gastrin 17 (G17) and the precursor, gly-gastrin 17 (gly-G17). The intent is to neutralize the ability of the gastrin hormone to further effect the growth and proliferation of particular cancers. Insegia consists of a synthetic gastrin-like peptide, which is linked to Diphtheria Toxoid (DT). DT contains the structures (epitopes) that generate an immune response in the patient. When patients are injected with Insegia it typically causes them to create antibodies that bind to both G17 and gly-gastrin 17 and remove them from circulation before they can bind to the cancer cells and initiate the signals that cause cancer cell growth and metastasis.

Insegia is placed in a slow-release suspension, or delivery vehicle. This combination is designed to achieve four objectives: (1) a high antibody response; (2) a durable antibody response; (3) limited systemic toxicity; and (4) long-term stability, or shelf-life. In our clinical trials, Insegia is administered by injection, with booster shots at approximately three to six-month intervals.

For more information about Insegia and Aphton pre-clinical product candidates (gastrinmonoclonal antibody & Radiogland) please visit Aphton's website www.Aphton.com.

2

13. In July 2002, the FDA granted Insegia "Orphan-Drug" status[2] for the treatment of gastric cancer and certain pancreatic cancers and in January 2003, the European Commission designated Insegia as an "orphan medicinal product" for the treatment of gastric cancer and pancreatic cancer. In October 2003, results from a Phase III clinical trial[3] of Insegia as monotherapy for the treatment of pancreatic cancer patients indicated that Insegia prolonged the expected survival of patients with pancreatic cancer. A subsequent Phase III study of Insegia in combination with chemotherapy for the treatment of pancreatic cancer did not achieve the primary study endpoint of an increase in subjects' overall survival rate; however, the results did show that a majority of test subjects achieved a desired antibody response and those patients demonstrated prolonged survival over the other patients in the study. Further, in both Phase III studies, no significant adverse events in patient safety occurred.

14. Insegia has also undergone Phase II testing[4] in combination with chemotherapy for use in treatment of gastric cancer. The results from this Phase II clinical trial were positive as well.

15. The Debtor contracts with varied clinical research organizations to conduct its clinical trials and sometimes collaborates with other companies in developing study protocols. Third party manufacturers supply the Debtor with the various components of Insegia for use in the clinical trials.

16. The Debtor also has a number of preclinical research and development programs, one of which focuses on a second generation of gastrin immuno-therapeutics including monoclonal antibodies directed against the same gastrin species as Insegia. The Debtor believes that passive gastrin immunotherapy will complement Insegia in a number of ways by (i) providing a means of treating Insegia non-responders, (ii) allowing sustained temporal serum levels of gastrin antibodies in patients with adverse reactions to Insegia preventing further immunizations and (iii) boosting titers in weak Insegia responders. This program is being developed under the Debtor's collaboration with Xoma.

17. Another research program, which is currently in the preclinical development phase, involves a radioactive gastrin peptide that is able to target radioactivity to gastrin receptor positive tumors such as gastrointestinal, small cell lung and medullary thyroid. The Debtor believes that such an approach may allow imaging of Insegia-responsive tumors and could ultimately be used as a therapy in its own right.

18. As of April 17, 2006, the Debtor held 15 U.S. granted patents, 19 pending U.S. filings, 3 pending EP filings, 41 granted foreign patents, 27 pending foreign filings and 4 PCT filings.

19. On March 24, 2005, the Debtor acquired all of the outstanding equity securities of Igeneon GmbH (formerly Igeneon AG) ("Igeneon"). Upon consummation of the acquisition by

---

[2] Orphan Drug status is available from the FDA at its discretion for drugs designed for the treatment of diseases affecting less than 200,000 patients nationwide.

[3] Phase III clinical trials are large-scale studies designed to provide enough data for statistical proof of a drug's efficacy.

[4] Phase II studies are designed to determine preliminary efficacy, optimal dosages and expanded evidence of safety of the drug being tested.

the Debtor of Igeneon's equity securities, Igeneon became the Debtor's wholly-owned subsidiary. Igeneon, headquartered in Vienna, Austria, is a clinical stage biopharmaceutical company.[5]

20. Since it acquired Igeneon, the Debtor has been Igeneon's sole source of financing. As a result, it is anticipated that Igeneon will file for bankruptcy, or a third party creditor will file for bankruptcy on behalf of Igeneon, with the appropriate court in Vienna, Austria shortly after the Debtor's filing. The bankruptcy proceedings for Igeneon would be separate from these proceedings and there is no guarantee that the Debtor, as Igeneon's sole shareholder, will realize any value from its equity ownership of Igeneon in connection with Igeneon's bankruptcy proceedings. The Debtor has no contractual or other obligation with any party to continue to fund the operations of Igeneon.

21. Aphton (BVI) Corporation is another wholly-owned subsidiary of the Debtor. However, Aphton (BVI) has no assets, liabilities or operations.

### C. Capital Structure

22. The Debtor's common stock commenced trading on The Nasdaq National Market on June 2, 1994. On July 25, 2005, its common stock was transferred to The Nasdaq Capital Market. Effective January 31, 2006, the Debtor's securities were de-listed from The Nasdaq Market and its shares began trading on the "pink sheets."

23. As of April 28, 2006, there were 274 record holders of Debtor's common stock. As of April 17, 2006, there were 67,056,428 outstanding shares of the Debtor's common stock.

24. As a result of a debt exchange in November 2005, the Debtor has 10,000 shares of Series A-1 Convertible Preferred Stock outstanding, which has a liquidation preference senior to the Debtor's outstanding common stock of $10,000,000. The Series A-1 Preferred Stock is convertible into shares of the Debtor's common stock at $0.50 per share, or 20,000,000 shares of common stock.

25. The Debtor does not have any source of operating revenue and has relied primarily on the capital markets as its source of funding. The Debtor had sufficient resources to maintain operations solely into the second quarter of 2006.

### D. Events Leading to Chapter 11 and Efforts to Avoid Same

#### a. Background

26. Prior to 2005, the Debtor had only one product-candidate in clinical development, Insegia, which was in a Phase III clinical trial. As a result, on December 15, 2004, the Debtor entered into a Stock Purchase Agreement to acquire all of the outstanding equity interests of Igeneon, which had two clinical products in the middle to late stages of clinical development, to

---

[5] Igeneon's leading products are IGN101, a cancer vaccine designed to induce an immune response against EpCam-positive tumor cells, and IGN311, a passive cancer immunotheraphy. Recent clinical trials of IGN101 were released and since the results were deemed neutral, Igeneon was required to go back and conduct further clinical trials to acquire more data. For more details on these and other Igeneon products please visit www.Aphton.com.

4

diversify the Debtor's product portfolio and provide a foundation for sustainable long-term growth. In connection with the potential acquisition, the Debtor had engaged UBS Securities LLC ("UBS"), as its investment banker, to assist the Debtor in the acquisition of Igeneon and to assist in raising funds for the combined Aphton-Igeneon entity after the acquisition. As a part of its engagement, a representative of UBS made a series of presentations to the management teams of both the Debtor and Igeneon as well as to the board of directors of each company about, among other things, the prospect of raising funds for the combined company after closing the acquisition. During the presentations, the UBS representative stated that, subject to market conditions, he believed that the combined entity would be successful in raising $30 million to $40 million after the acquisition, even if the Debtor's Phase III clinical trial was not successful.

27. On February 14, 2005, the Debtor announced that its Phase III clinical trial had not met its primary end-point. As a result, the Debtor's stock price eroded from $3.13 at the close of the markets on February 15, 2006, to $1.70 at the close of the markets on February 15, 2005.

28. On March 22, 2006, the Debtor received the affirmative vote of a majority of its stockholders to consummate the acquisition of Igeneon. On March 24, 2005, the Debtor closed its acquisition of Igeneon.

### b. Cost Reduction Program

29. Shortly after the acquisition of Igeneon, the Debtor began implementing a cost-reduction program intended to align its expenses with product development priorities with the goal of improving its operating efficiencies. In addition, the Debtor continued to evaluate its costs and priority programs through the remainder of 2005 and into 2006 and implement additional cost-reduction measures.

### c. Pursuit of Financing Opportunities

30. After consummation of the acquisition, the Debtor worked with representatives of UBS to seek financing opportunities in the U.S. capital markets. However, the Debtor's and UBS' initial efforts were not successful because, at the time, there was $23 million of convertible debt on the Debtor's balance sheet, with a "put" right coming due on April 1, 2006 for $20 million of the debt. In addition, the conversion price of the entire outstanding principal amount of the debt exceeded the then market price of the Debtor's stock. Accordingly, investors expressed concern that a significant portion of any financing would be used to repay the outstanding debt, not for Debtor's operations. As a result, the Debtor and UBS began discussing the possibility of spinning-off a portion of Igeneon in the European markets as an alternative to raising funds in the U.S. capital markets. However, because of certain adverse conditions in the European capital markets, this opportunity never materialized.

### d. Parallel Paths

31. During July and August 2006, the Debtor began pursuing multiple parallel paths of strategic opportunities. First, in April 2006 discussions began with sanofi-pastuer (successor Connaught Laboratories Limited) ("sanofi"), a collaborative partner of the Debtor's at the time, to terminate their collaboration on Insegia because sanofi's interests were not properly aligned

with the Debtor's and sanofi had certain licensing rights to Insegia in North America and Europe, which limited the Debtor's ability to find another collaborative partner interested in assisting the Debtor in further developing Insegia. As a result, on November 7, 2005, the Debtor entered into a termination agreement with sanofi, terminating the parties' strategic alliance. In connection with the termination of the alliance, the Debtor repaid $3 million of debt owed to sanofi in exchange for the return of all North American and European rights to Insegia and the cancellation of a $1.9 million payable owed to sanofi.

32. Second, on July 21, 2005, the Debtor entered into an engagement letter to engage UBS as its exclusive financial advisor to seek strategic opportunities including licensing or selling a significant portion or all of our intellectual property and/or other assets, the sale or exchange of a significant portion or all of our equity, or pursuing other financial alternatives.

33. After some time, however, it became apparent to the Debtor that UBS' efforts to find appropriate strategic opportunities for the Debtor would not be successful. Accordingly, the Debtor requested and received from UBS a waiver of certain of its rights under the engagement letter so the Debtor could engage an investment banker more suitable to assist the Debtor in its strategic endeavors.

34. Third, the Debtor began negotiating with the holders of $20 million of outstanding principal on the Debtor's convertible notes to exchange the notes for a combination of cash and equity. As a result of the waiver from UBS and in connection with its negotiations with the note holders, on September 29, 2005, the Debtor engaged Oppenheimer & Co. Inc. ("Oppenheimer") to assist the Debtor with the exchange of the outstanding $20 million in debt.

35. On November 23, 2006, the Debtor closed the note exchange, whereby the holders of outstanding $20 million convertible notes surrendered their notes to the Debtor for cancellation in exchange for (i) $3 million in cash, (ii) 6,500,000 shares of common stock and (iii) 10,000 shares of the Debtor's Series A-1 Convertible Preferred Stock.

36. As a result of its $3 million payment to sanofi and the consummation of the $20 million debt exchange, the Debtor no longer had any long term debt on its balance sheet. Accordingly, the Debtor retained Oppenheimer to pursue strategic alternatives for the Debtor.

37. In addition to a number of other strategic partner candidates, in November 2005, Oppenheimer introduced the Debtor to Spectrum Pharmaceuticals, Inc. ("Spectrum"). After lengthy negotiations and an extensive due diligence review, Spectrum expressed significant interest in pursuing a strategic opportunity with the Debtor. Ultimately, however, on December 9, 2005, Spectrum informed the Debtor that they were not prepared to pursue any opportunities at that time.

e. **Celltrion**

38. Independent of its efforts with the aforementioned investment bankers, in July 2005, Igeneon had entered into a product collaboration with Celltrion, Inc. for IGN311. Under the terms of the collaboration, Igeneon granted to Celltrion an exclusive license to commercialize IGN311 in certain Asian countries in exchange for milestone payments and royalties from Celltrion. In addition, under the terms of the collaboration, Celltrion would provide development

6

and manufacturing services related to the optimization and upscaling of IGN311 as well as material for further clinical development, which, in the aggregate, was estimated at an approximate value of $15 million in services and material.

39. On February 7, 2006, Igeneon entered into a letter of intent with Celltrion to expand the collaboration into Europe. Under the terms of the letter of intent, Igeneon would, among other things, expand the existing license to permit Celltrion to commercialize IGN311 in Europe. In return, Igeneon would receive from Celltrion an up front payment of $5 million and milestone payments of up to $15 million. In addition, Igeneon would receive royalties on sales of each product in both territories and Celltrion would assume all clinical development costs for IGN311 in both territories. The value of the expansion was estimated to be not less than $40 million in the aggregate. Accordingly, the Debtor, as Igeneon's sole source of financing, would have benefited significantly from consummation of the expansion. However, because of primarily concerns about the combined company's liquidity condition, in April 2006, both parties agreed to postpone finalizing the expansion of the collaboration until such time the Debtor could address its liquidity condition.

### f. Engagement of Life Science Group

40. On February 16, 2006, the Debtor engaged Life Science Group ("LSG") as the Debtor's exclusive financial advisor to seek strategic opportunities.

41. Independent of LSG's efforts, in late February 2006, Spectrum revisited its review of the Debtor's business and informed the Debtor that it had a renewed interest in pursuing a strategic transaction with the Debtor, at which time the Debtor and Spectrum engaged in extensive negotiations and Spectrum conducted an additional due diligence review of the Debtor's operations.

42. Despite preparing a term sheet in which it proposed to offer $14 million in stock to acquire all of the outstanding equity interests, and assume all of the liabilities, of the Debtor, on March 9, 2006, Spectrum informed the Debtor that it again was not prepared to move forward with the acquisition at that time.

43. In connection with its efforts on behalf of the Debtor, on or about March 17, 2006, LSG introduced the Debtor to NGN Capital, a hedge fund located in New York ("NGN"). After length negotiations and an extensive due diligence review, in April, 2006, the Debtor entered into a letter of intent with NGN, whereby NGN would be the lead investor, investing $5 million, of a syndicate of investors for a round of financing of not less than $20 million.

44. After entering into the letter of intent, NGN continued to conduct its due diligence review of the Debtor and on or about May 4, 2006, engaged outside counsel to prepare definitive documents for the transaction. In addition, the Chief Executive Officer of the Debtor and representatives of LSG met with numerous investors to build a syndicate of investors for the financing. As a result of those efforts, a syndicate of investors agreed to commit $16 million to the financing.

45. After numerous discussions between the Debtor's counsel and NGN's counsel regarding, among other things, the definitive agreements, NGN informed the Debtor on May 12,

7

2006 that the financing was on hold because of certain internal issues at NGN. On May 15, 2006, the Debtor was informed by NGN that NGN would no longer be interested in continuing to pursue the financing. The Debtor initially attempted to continue negotiations with other investors in the syndicate, but when those attempts failed, the Debtor determined that its only option would be to file for bankruptcy protection.

E.  **Maximizing Recovery for the Benefit of Creditors - Debtor's Plan of Reorganization**

46. The Debtor, in consultation with its financial and legal advisors has determined that the best way to maximize value for the benefit of its creditors is to continue operating effectively as a debtor-in-possession following the filing of its chapter 11 case and maintain its going concern value pending the marketing and sale of its assets pursuant to Section 365 of the Bankruptcy Code.

## II. FIRST DAY MOTIONS AND APPLICATIONS

A.  **Motion for Order Authorizing Maintenance of Debtor's Cash Management System and Bank Accounts, Continued Use of Existing Business Forms and Continued Investment Practices**

47. The Debtor seeks authorization to maintain its pre-petition cash management system, bank accounts and existing business forms.

48. Prior to the Petition Date, the Debtor maintained a centralized cash management system and bank accounts (the "Accounts") to manage its payroll and other operating matters in the ordinary course of the Debtor's business. The Debtor seeks a waiver of the United States Trustee's requirement that the Accounts be closed and new post-petition bank accounts be opened. If enforced in this case, this requirement would cause significant disruption to the normal operation of the Debtor's business. Maintenance of the Bank Accounts would greatly facilitate a smooth and orderly transition into the chapter 11 case.

49. The Debtor should also be permitted to continue to use its existing business forms without alteration or change to a "debtor-in-possession" designation. Changing business forms would be expensive and time consuming, would cause disruption and delay and would serve little purpose in the context of this case.

50. The Debtor currently has in place record keeping systems that will be able to ensure the proper accounting of all pre-petition and post-petition transactions. Upon information and belief, only checks issued in the ordinary course of Debtor's business, with the exception of checks issued to counsel and other professionals as retainers, are or may be outstanding against the Accounts.

51. In order to continue the Debtor's business with as little disruption as possible and to retain the going-concern value of Debtor's assets, the stability, continuity, timeliness and efficiency of Debtor's business operations must be preserved. A smooth transition from pre-petition operations into post-petition operations depends greatly upon the consistency of Debtor's daily banking, accounting and business practices. Authorization to continue the present

cash management system, use of existing accounts and existing business forms is essential to a smooth transition and stability of the Debtor.

**B.**  **Motion for Order (I) Authorizing (A) Payment of Prepetition Wages, Salaries and Employee Benefits, (B) Reimbursement of Employee Business Expenses, and (C) Payment of Other Employee-Related Amounts, and (II) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay All Checks and Drafts Drawn on Debtor's Bank Accounts Relating to the Foregoing**

52. The Debtor seeks authorization to pay, at its discretion, certain accrual pre-petition wage and employee benefit obligations.

53. The Debtor regularly pays wages and salaries, federal and state withholding taxes, payroll taxes, contributions to employee benefit plans and other employee benefits in the ordinary course of its business, as well as reimbursable employee expenses (all such payments, contributions and obligations as described herein and in the wage motion, the "Employer Obligations").

54. In the ordinary course of its business, the Debtor makes payroll deposits on a semi-monthly basis. Pre-petition the average aggregate gross semi-monthly payroll to all employees of the Debtor was approximately $90,000.00. The employees have been paid for the payroll period ending May 15, 2006 which amount is reduced due to certain workforce reductions. All employees are paid by direct deposit to accounts specified by the employees. The Debtor believes that as of the Petition Date, approximately $60,835.00 in accrued pre-petition wages and salaries is due and owing to Debtor's employees for services rendered within the 90-day period immediately preceding the Petition Date.

55. The Debtor maintains one account to manage and control wage disbursements and payment of employee benefits and reimbursement of employee expenses. Payment of employee wages is routinely made by the Debtor by direct deposit into employees' designated accounts. Other disbursements may be made by company check into the employee's designated account or delivered to the employee.

56. Items of current compensation and priority compensation were due and owing on the Petition Date because, *inter alia*, (a) the Chapter 11 petition was filed in the midst of one of the Debtor's regular and customary salary and hourly wage payroll periods, (b) some checks issued to employees prior to the Petition Date may not have been presented for payment or cleared the banking system and therefore not honored and paid as of the Petition Date, and (c) employees have not yet been paid all their salaries and wages for services previously performed on behalf of the Debtor pre-petition.

57. The Debtor has incurred pre-petition obligations to former employees for accrued vacation and personal time off and has incurred pre-petition obligations to employees for vacation, holiday, sick leave and severance pay and employer cash contributions to employee benefit plans. The Debtor believes that as of the Petition Date, approximately $84,363.00 is due and owing for such obligations.

58. As of the Petition Date, employees of the Debtor had incurred or had accrued in their favor various sums for (i) employee business expenses, including, without limitation, business meals, phone costs and other miscellaneous business purchases made on behalf of the Debtor (the "Employee Amounts"), and (ii) other standard employee benefits, including, without limitation, employee IRA contributions. The Debtor does not believe that any such sums remain unpaid, but seeks authorization to pay any claims for same that may arise.

59. The Debtor maintains various plans and policies to provide employees with medical and workers' compensation insurance and other similar, standard employee benefits including, without limitation, the following (the "Employee Benefits"): (a) medical insurance is provided through a premium-based insurance plan; (b) the Debtor deducts from its employees' paychecks payroll taxes and the employees' portion of FICA and unemployment taxes, employee contributions for health benefits and legally ordered deductions such as wage garnishments, child support and tax levies, if any. The Debtor forwards amounts equal to any employee deductions from its operating accounts to appropriate third-party recipients. Funds may have been deducted from employee salaries but, due to the commencement of this Chapter 11 case, may not have been forwarded to appropriate third-party recipients; (c) the Debtor provides workers' compensation insurance through premium based workers' compensation insurance programs. The estimated annual premium for workers' compensation insurance is approximately $9,304.00.

60. The Debtor believes that any delay in paying the Employee Benefits, Employee Amounts or other Employer Obligations could severely disrupt the Debtor's relationship with its employees and irreparably impair the employees' morale at the very time when their dedication, confidence and cooperation are most critical. The Debtor must also continue its corporate policy of permitting certain of its employees to incur business-related expenses and thereupon seek repayment thereof by submitting appropriate evidence of such out-of-pocket expenses. If it does not pay the employee obligations and reimbursable expenses, some or all of the Debtor's employees would suffer serious personal hardships, which in turn would cause them to seek other employment and/or no longer make their services available to the Debtor. Given the importance of the employees to the Debtor's operations, any significant loss of their services would severely hamper the Debtor's business operations and potentially result in severe erosion of its value and be detrimental to the Debtor's estate. Debtor believes it is a prudent exercise of its business judgment to use its assets to pay timely all wages and employment related expenses, whether pre-petition or post-petition, as they come due in the ordinary course of business.

C. **Motion for Order (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services and Deeming Them to Have Adequate Assurance of Payment Pending Negotiation or Determination of Adequate Assurance of Payment, (II) Modifying the Amount of Assurance of Payment Demanded by a Utility Company, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance of Payment**

61. Debtor seeks an order for this Court pursuant to 11 U.S.C. §366 prohibiting the Utility Companies from altering, refusing or discontinuing its utility services to the Debtor.

62. The Debtor obtains electricity, telephone and other utility services from approximately seven different utility companies (the "Utility Companies"). Uninterrupted utility services are essential to the ongoing operation of the Debtor's business and the preservation of

the value thereof. If the Utility Companies refuse or discontinue services, even for a brief period, then the Debtor's operations would be severely disrupted. The impact on business operations jeopardize the Debtor's ability to preserve and/or maximize its value as a going concern. Therefore, it is critical that utility services continue uninterrupted. Based upon the foregoing, the Debtor believes that the relief requested is necessary and in the best interests of the Debtor's estate and its creditors.

63. The Debtor has adequate cash to pay its post-petition utility services in a timely manner. The Debtor is current on its pre-petition obligations to the Utility Companies in substantially all instances, and the Debtor owns assets and has no secured debt. Further, the procedure for determining adequate assurance properly balance the Debtor's operational needs and the Utility Companies' potential concerns.

D. **Debtor's Expedited Motion Order: (I)(A) Establishing Bidding Procedures in Connection with Sale of Substantially All of the Assets of the Debtor, Including Certain Bidding Incentives, (B) Approving the Form and Manner of Notices, (C) Setting a Sale Hearing, and (D) Granting Related Relief; (II) Approving the Sale Of Substantially All of the Assets of the Debtor Free and Clear of Liens, Claims and Encumbrances to the Successful Bidder; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases; and (IV) Approving Procedures for the Rejection of Certain Contracts And Leases**

64. The Debtor believes that the best way to maximize the value of the Debtor's estate is to market and ultimately sell its assets. Accordingly, the Debtor is focusing its efforts principally on stabilizing its operations and maintaining its going concern value, evaluating reorganization options and implementing a formal post-petition marketing process for the sale of the Assets. To this end, the Debtor seeks approval of the proposed bidding, auction and sale procedures under 11 U.S.C. § 363 and the proposed assumption/rejection procedures under 11 U.S.C. § 365.

65. The Debtor has conducted and continues to conduct an extensive marketing process by targeting buyers based on a variety of factors, including the buyer's perceived interest in the Debtor's assets, its familiarity with the Debtor's business and its financial ability to consummate a transaction with the Debtor. Overall, the Debtor has identified approximately 28 parties as the most likely potential acquirers of the Debtor's assets. The Debtor has identified a number of less likely purchasers which it will also contact regarding their potential interest in the Debtor's assets.

66. Both prior to and following the Petition Date, the Debtor has sent or will send initial marketing materials to approximately 28 parties, has coordinated confidentiality agreements with and sent offering memoranda to potential buyers, has facilitated due diligence with and has arranged for actual on site visits for potential buyers. The Debtor has assembled data and documents to facilitate the diligence process and has prepared (and in some cases made) business presentations to provide for an organized and efficient transmission of a large amount of data related to its assets.

67. The Debtor has had discussions with a number of potential purchasers regarding the terms of a sale transaction involving all, or substantially all, of its assets. While the

11

discussions have been productive in generating interest from several sources, as of the date hereof, however, no asset purchase agreement has been executed with any such party.

68. Although the Debtor has undertaken an exhaustive solicitation of virtually all known likely acquirers, the Debtor intends to re-canvass all known potentially interested bidders for the assets and business in an effort to maximize interest on the part of potential bidders in the possible acquisition of the Debtor's assets and business.

69. Despite the absence of a completed "stalking horse" bidder at this time, it is critical that the Debtor's sale process move forward and that a sale of the Debtor's assets and business conclude as quickly as possible. Given (a) the Debtor's relative lack of liquidity, (b) the competitive nature of the industry in which the Debtor operates and (c) the extensive and continuing marketing efforts to sell the Debtor's assets and business to date (both pre and post-petition), the Debtor believes that proceeding with the sale process is the best way to maximize the value of the assets and business for the benefit of its estates, creditors and other stakeholders

70. The Debtor cannot sustain an extended postpetition sale process. The Debtor believes that the going concern value of its assets and business and, therefore, the consummation of the sale or any alternative transaction that includes the assets and business will be seriously jeopardized unless the sale process is authorized without delay. A prompt and open sale of the assets and business in which all interested buyers are encouraged to participate is the best way to maximize value for its estate, and the bidding procedures described in the Debtor's sale motion are the most effective method of obtaining the highest and best offer for the assets and business.

71. In addition, the flexibility afforded to the Debtor in the sale procedures to obtain the best offer will allow the Debtor to bring before the Court and all interested parties the highest and best offer for the Debtor's assets.

### E. Motion for Authority to Pay Certain Taxes, Fees and Other Government Charges in the Ordinary Course of Business Pursuant to 11 U.S.C. §§105, 507(a), 541 and 549

72. The Debtor also seeks authority to pay, at its discretion, certain pre-petition outstanding taxes, fees or other government charges.

73. In the normal operation of its business, the Debtor incurs or collects some or all of the following: certain withholding, use, business and similar taxes and other government charges and assessments (collectively, the "Ordinary Course Taxes"). The Ordinary Course Taxes are payable to various federal, state, and local taxing authorities and other government agencies (the "Taxing Authorities"). The Ordinary Course Taxes are payable in arrears on a periodic basis, typically monthly or quarterly.

74. The Petition Date occurred during the course of several accrual periods for the Ordinary Course Taxes. As of the Petition Date, therefore, the Debtor has collected or otherwise accrued Ordinary Course Taxes that are payable in arrears to the Taxing Authorities. The Debtor estimates that the amount of unpaid Ordinary Course Taxes collected or accrued through the Petition Date total approximately $25,000.00 and other amounts as may be described in the tax motion.

75. Payment of the Ordinary Course Taxes will reduce administrative burdens on the Debtor and free the Debtor's management to focus on the Debtor's reorganization. I was advised that a significant portion of the Ordinary Course Taxes, including, without limitation, sales and payroll taxes, are "trust fund" taxes that the Debtor is required to collect from third parties and hold in trust for payment to the Taxing Authorities. Efforts by the Taxing Authorities to pursue responsible person liability for trust fund taxes will be extremely distracting to the Debtor's key personnel and will interfere with the efforts to sell the Debtor's assets and maximize the recovery for the Debtor's creditors. In addition, apportioning the Ordinary Course Taxes between pre-petition and post-petition accruals and collections will be difficult and time consuming. The Debtor believes that remaining current on the Ordinary Course Taxes is in the best interest of the Debtor, the Debtor's estate, creditors, equity security holders and other parties in interest.

## III. CONCLUSION

WHEREFORE, the undersigned declares under penalty of perjury that the foregoing is true and correct for all of the reasons set forth above, and respectfully requests that the Court grant the relief requested in each of the first day motions and applications filed concurrently herewith.

Executed this 23rd day of May, 2006.

APHTON CORPORATION

By: _____
Name: Patrick T. Mooney, M.D
Title: Chief Executive Officer

SWORN TO AND SUBSCRIBED
before me this 23rd day of May, 2006.

_____
Notary Public
My Commission Expires: _____
(SEAL)

NOTARIAL SEAL
Maxine M. DiRenzo, Notary Public
City of Philadelphia, Phila. County
My Commission Expires September 15, 2009

M0543831.DOC